Filed 9/28/23  P. v. Jones CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>ALBERT JONES,<br><br>        Defendant and Appellant. | A164421<br><br>(Alameda County<br>Super. Ct. No. 17CR004778) |

What began as a dispute between defendant Albert Jones and his former friend Alexander Martinez over unpaid rent and stolen equipment culminated in Jones's conviction for the murder of Martinez.  Along the way, Jones opened multiple life insurance policies in Martinez's name totaling well over one million dollars, tracked Martinez's whereabouts for many months, hired someone to kill Martinez, and attempted to collect the insurance money after Martinez's murder.

Following his arrest, Jones made several incriminating statements to law enforcement that he claims were obtained in violation of his *Miranda*[1] rights.  Some of these statements were excluded at his first trial, which ended in a hung jury.  At his second trial, the court made the same evidentiary rulings regarding Jones's statements, with one exception—the court admitted

_____

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

1

the previously suppressed evidence of Jones's statements that he had paid someone to kill the victim. There were also salient differences in some witness testimony. The second jury found Jones guilty of first degree murder for financial gain.

On appeal, Jones raises several claims: (1) the incriminating statements were elicited following two full invocations of his *Miranda* rights; (2) the incriminating statements were subject to selective invocations of his *Miranda* rights; (3) the trial court had no reason to change its prior evidentiary ruling; (4) the change in the evidentiary ruling was erroneous; and (5) the prosecutor improperly commented on Jones's refusal to answer certain questions during closing argument. Finding no prejudicial error, we affirm.

BACKGROUND

### Murder of Alexander Martinez

On April 10, 2016, at 10:30 p.m., Alameda County Sheriff's Deputies responded to a shooting at a music studio in Castro Valley. They found Martinez lying on the ground in a pool of blood with a gunshot wound to the head. Martinez was taken to the hospital and died a few hours later.

Alameda County Sheriff's Office Detective Joshua Armijo arrived at the scene and spoke with the primary responding officers. He also interviewed an eyewitness, B.T., at the Sheriff's office on the night of the murder. In the days following the murder, he interviewed Martinez's girlfriend, as well as two of Martinez's friends who worked with him at the music studio. The interviews did not generate any leads.

### Police Investigation and Charge

In February 2017, Detective Armijo received a call from the Hercules Police Department about two individuals, M.P. and J.M., with information

2

connecting Jones to the homicide. Based on their statements, Detective Armijo obtained an arrest warrant for Jones and search warrants for M.P.'s house in Pittsburg and Jones's two houses in Hercules.

The search warrants resulted in the discovery of "numerous pieces of mail, life insurance policy mail, . . . as well as debit cards, credit cards, bearing the name of Alexander Martinez, as well as the policies in the name of Alexander Martinez." Additional insurance policies in the name of Martinez were identified during the course of the investigation. In total, five life insurance policies amounting to well over one million dollars and all listing M.P. as the beneficiary were uncovered.

While the search warrants were being executed, Jones was arrested and brought to the police station. After receiving a *Miranda* warning, Jones made a series of incriminating statements and admissions, including: (1) Jones wanted revenge because Martinez had disrespected him by failing to pay the agreed upon rent and by stealing equipment from Jones's house; (2) Jones searched for Martinez for several months and then put a tracker on Martinez's car; (3) Jones initially just wanted to beat up Martinez but decided it was more of a "two birds with one stone" situation, meaning he could not only hurt Martinez but also use the insurance money to refinance his house and to move forward with his life; (4) Jones paid someone to kill Martinez; and (5) Jones saw his vacation as a " 'perfect' " time to execute his plan.

In January 2019, Jones was charged by information with murder for financial gain. (Pen. Code, §§ 187, 190.2, subd. (a)(1).)

### First Trial

In advance of trial, Jones filed a motion to suppress the statements he made to police on the night of his arrest. The trial court granted the motion

3

in part and denied it in part, ruling that Jones did not make an unambiguous and unequivocal assertion of his right to remain silent. Nevertheless, the court determined Jones had selectively invoked his right to remain silent by declining to respond to questions regarding the following topics: (1) the number of life insurance policies taken out; (2) the policy application process; (3) how Jones found the shooter; (4) the price of the murder contract; (5) the manner and means by which Jones communicated with the shooter; and (6) whether Jones still owed money on the contract. Among the specific statements suppressed was Jones's statement that he paid someone to kill Martinez.

The first trial took place over six days in August 2021. The People called law enforcement personnel, an insurance expert, and J.M. as witnesses. The transcripts of B.T. and M.P.'s preliminary hearing testimony were read to the jury as B.T. could not be located and M.P. had died. Portions of Jones's videotaped interview were also admitted and played for the jury.

After three days of deliberations, the jury deadlocked at 6-6 and the trial court declared a mistrial.

### *Second Trial*

The second trial occurred over five days in November 2021. The jury found Jones guilty of first degree murder and found true the special allegation of murder for financial gain.

The People filed a pretrial motion requesting the court "to reconsider" its previous *Miranda* rulings. The People sought to introduce evidence that Jones said he "was going to pay X amount of dollars for somebody to take care of him," which he clarified meant to shoot Martinez. The People argued this "arrangement exchange" did not fall within the six categories the court

4

previously determined Jones had selectively invoked his right to remain silent. The trial court admitted the arrangement exchange, finding it was not covered by the six categories over which Jones had selectively invoked his right to remain silent. The remainder of its *Miranda* rulings were identical to those made in the first trial.

### *Evidence at Second Trial*

As before, law enforcement personnel, an insurance expert and various witnesses testified. As in the first trial, evidence was introduced that multiple insurance policies with an aggregate value of $1,350,000 had been opened in Martinez's name and all listed M.P. as the beneficiary. Also as before, the jury watched portions of the video showing Jones's questioning by the detectives.

Different from the first trial, B.T. testified in person, J.M. admitted she misrepresented her interaction with the attacker to the police and lied at the first trial when she said the attacker had asked about drugs, and video excerpts of Jones's questioning included the previously redacted statement that Jones was going to pay someone to kill Martinez.

#### *B.T.*

B.T. testified in person at the retrial. B.T., a local musician, was with Martinez at the time of the shooting. They were listening to music in the parking lot of the studio in Martinez's car when a man approached them holding a gun. The man said, "don't move" and told them to "[e]mpty your pockets." B.T. got on the ground and emptied his pockets but the man did not take any of the items. Martinez initially hesitated but eventually complied and also got on the ground. As Martinez attempted to pull out his wallet, the man shot Martinez. The gunman threatened to kill B.T. if he moved. When the shooter was no longer in sight, B.T. called 911.

5

*J.M.*

J.M. testified she worked with Jones and M.P. in 2016 at a transportation company in Concord. She lived with M.P. for several months in an apartment in Concord they subleased from Jones. Jones had a sexual relationship with both J.M. and M.P. during that time, which caused tension between J.M. and M.P. In October 2016, J.M. and M.P. moved out of the apartment and J.M. moved into a house in Hercules owned by Jones. At that time, M.P. gave her a shoe box containing life insurance papers; J.M. brought the papers with her to her new home in Hercules.

Jones later told J.M. he had life insurance policies in Martinez's name. J.M. had never met Martinez and did not know him; Jones told her "Alex had owed him money for rent and wouldn't pay him" and had "robbed" Jones's house. Jones told J.M. "he had Alex murdered" when Jones was out of town; Jones showed J.M. photos in his phone that established he was away at the time of the murder.

On February 10, 2017, J.M. was in the garage of the house in Hercules when she was attacked by an unknown man. The man asked J.M. if Jones was home and hit her with a piece of wood, causing her to need neck surgery. The man also mentioned Martinez's name. A few days later, J.M. spoke to the police and explained the events leading up to her attack.

On cross-examination, J.M. admitted that when she spoke to the police at the hospital she did not mention the attacker had asked about Jones and Martinez; she also admitted she lied at the first trial when she said the attacker had asked about drugs. J.M. had not mentioned that the attacker had asked about Jones and Martinez because she was afraid for her life.

*M.P.*

As in the first trial, M.P.'s preliminary hearing testimony was read to the jury.

In 2015, M.P. worked with Jones and J.M. at a transportation company and lived with Jones in an apartment in Concord. In 2016, Martinez moved into the apartment and Jones moved out to live at his mother's house. Jones became upset with Martinez about an unpaid utility bill and because Martinez had stolen property from Jones. Jones told M.P. "he was going to hire someone" to kill Martinez; M.P. did not think Jones was serious. When Jones told her he had put a tracker on Martinez's car, M.P. was concerned for Martinez, but she did not think Jones was going to kill Martinez. Jones returned from vacation and told M.P. "it was done," which she later realized meant "he had him killed."

After Martinez was killed, Jones showed M.P. paperwork with her name on it and explained she was "the beneficiary of Alex Martinez." Jones "wanted [M.P.] to call these life insurance companies" and he coached her on what to say when she called. Jones took M.P. to a lawyer and told her to say she was Martinez's fiancée. M.P. signed several documents before a notary. M.P. did what Jones told her because she was afraid for herself and her family as Jones had threatened her daughter and her grandson.

## DISCUSSION

## I.   Trial Court Properly Admitted Jones's Statements

Jones argues that evidence of his statements should have been suppressed because he completely invoked his right to remain silent on two separate occasions, both of which were ignored. In the alternative, to the extent the trial court determined he had selectively invoked his right to remain silent, he contends the trial court should have suppressed more of his

statements because the selective invocation occurred earlier than the point selected by the trial court.

## A. Relevant Proceedings

The videotape and the corresponding transcript of the questioning[2] show the following:

Detective Armijo and his partner questioned Jones for approximately six hours in a calm and conversational atmosphere.[3] During this lengthy interview, Jones was not handcuffed and was repeatedly offered and provided water and food.

At the outset, Detective Armijo advised Jones of his *Miranda* rights; Jones said he understood his rights and was willing to talk to the detectives. Jones first met Martinez when Martinez was 15 or 16 years old. Jones had mentored Martinez and they had remained friends. At some point, Jones rented part of his house to Martinez, and Martinez owed him seven months of rent at $900 per month. After Jones gave Martinez a 30-day notice to vacate the apartment, followed by an additional 60 days, Martinez moved out and Jones changed the locks. Jones and Martinez did not speak after Martinez moved out. Jones learned about Martinez's murder after he returned from a vacation in Cabo San Lucas.

---

[2] On our own motion, we augmented the record on appeal with the video recording and corresponding transcript. We have reviewed the entire video and corresponding transcript.

[3] Jones asserts the detectives became "confrontational" and had "clearly lost their patience" several hours into the interview. While the detectives were certainly persistent in their questioning, nothing in the record demonstrates that they ever became confrontational or otherwise expressed any impatience. As seen in the video, the detectives sat patiently, sometimes for several minutes at a time, as they waited for Jones to respond to their questions. In any event, Jones does not challenge the voluntariness of his statements.

After a couple of hours, the detectives[4] told Jones his account did not make sense. They urged Jones to tell the truth so as to not appear unfeeling, cold, calculating, and evil. Jones said little while the detectives implored him to tell his side of the story. Eventually, Jones said, "I've just done so much for [Martinez] over these years, and he just kept screwing me over, kept screwing me over. Okay, that's fine. Then when he moved into my house he tried to punk me and stuff like that by not paying and it didn't rub off right, of course. How can somebody that you've helped, and mentored, and stuff like that just be disrespectful? He had come back and apologized, so then everything was fine, and then he disrespected me again on top of that not paying and everything. Then when he didn't move and he tried to punk me to pay for his deposit, his moving expenses, and things of that nature, and then after I changed the locks he came back to the house and robbed me. I had all my tools out there and stuff like that, so just insult to injury."

Jones continued, "They came back and robbed thousands of dollars of tools that I had that I was working on the house. For what reason? He already got over on me not paying on the rent [¶] . . . [¶] Just over and over people keep screwing me over when you're trying to be a good person." "For a while, it was like he was like my brother type of thing. For him just to rob me after being disrespectful just was the last straw, I guess. *That's all I want [to] say. You guys can go home to your wives and stuff like that.*" (Italics added.) According to Jones, this is the first time he completely invoked his *Miranda* right to remain silent. The detective said, "My wife probably prefers when I'm at work. I've been married going on 19 years now, so she's probably pretty happy when I'm gone, staying away from her for a

---

[4] At times, it is unclear from the video and transcript which detective is speaking.

while." Jones said, "My thinking, just . . . What was I thinking? I should be smarter than this. I am smarter than this." A little later, Jones added, "I think I just had enough of just, like I said before, people just screwing me over, and screwing me over, and screwing me over. Me trying to be the good person. They always say, 'Walk away.' They always say, 'Be the bigger, better person.' There's [sic] only so many times you can do that."

Approximately 19 times during the multi-hour interview, by either saying skip or words with similar import, Jones said he wanted to not respond to certain questions regarding the insurance policies, the shooter's identity, and how Jones contacted and paid him. For example, when asked about the number of policies he opened and if they were difficult to open, Jones replied, "I'd rather skip that" and "I'd rather skip that too." When the detective asked how Jones contacted the shooter, Jones replied, "That, I'd rather skip." Questions about the cost of the murder contract and if money was still owed were met with, "Skip that one" and "Skip." When asked if he had any help opening the policies, Jones said, "I'd rather skip that for now." After indicating several more times that he would like to "skip" (or words to similar effect) the questions being posed, the detective asked, "Is there anything else you want to get off your chest right now?" Jones replied, "*No, that's it.*" (Italics added.) Jones asserts this is the second time he completely invoked his right to remain silent.

After a food break, Jones continued to insist he did not know who the shooter was and said he wanted to skip or not answer questions about the shooter's identity. The detective asked, "Do you think you'd ever answer it?" Jones replied, "Nah." This is the point where the trial court found Jones had selectively invoked his right to remain silent as to the shooter's identity.

Jones went on to say, "It's my fault [¶] . . . [¶] I just overreacted." Jones also said, "it's going to be hard enough to survive once I get in [to prison], but if they see that I've been talking, it's going to be even harder to survive . . . [¶] So it's more about survival right now . . . [¶] [F]or survival I'd rather just not say anything."

Jones said he initially wanted to find Martinez, beat him up, and take back his property. After months of looking for Martinez, Jones's anger grew, and he decided to kill "two birds with one stone." When the detective asked for clarification, Jones said, "Revenge, and if everything worked out right [¶] . . . [¶] I was going to use [the insurance policy] money to start moving forward." Eventually, Jones found Martinez's car and put a tracker on it. Jones kept asking different people if they knew anyone who he could hire to kill someone. Finally, he found "somebody that knows somebody, that knows somebody, that knows somebody type of thing . . . They don't know me, I don't know them." The detective asked, "what was the arrangement that was made?" Jones replied, "I was going to pay X amount for somebody to take care of him [¶] . . . [¶] To shoot him . [¶] . . . Alexander Martinez." When asked if he had a specific date set, Jones replied, "Not originally, but when the vacation opportunity came up, I was like, " 'That would be perfect.' "

Jones later met with an assistant district attorney and district attorney inspector who confirmed he had received his *Miranda* rights from the detectives. Jones voluntarily spoke with the district attorney after receiving another *Miranda* advisement. In this conversation, Jones said that in the "10 to 15 years" he had known Martinez, "all the little stuff . . . just added up." And things "went over" following the September 2015 robbery. Jones admitted that during the "months" he searched for Martinez his "anger

11

grew[.]" Jones further admitted that Martinez was killed in April, which he had "thought . . . would be a good time" because he would be in Mexico.

### B.     Applicable Law and Standard of Review

Under California law, issues relating to the suppression of statements made during a custodial interrogation are reviewed under federal constitutional standards.  (*People v. Flores* (2020) 9 Cal.5th 371, 416–417 (*Flores*).)  To protect suspects' *Miranda* rights, before questioning begins "individuals in custody must be advised of their right to remain silent, that anything they say may be used as evidence against them, and that they have the right to the presence of an attorney, whether retained or appointed. [Citation.]  But a suspect can waive these rights and agree to speak with law enforcement." *(Flores*, at p. 417.)  A suspect's waiver of his right to remain silent may be selective; he may rule out certain topics or affirmatively limit the scope of subjects he is willing to discuss.  (See *Michigan v. Mosely* (1975) 423 U.S. 96, 104–106 (*Mosely*) [no *Miranda* violation where officer honored suspect's refusal to discuss robberies when, following a break, a different officer questioned defendant about a different crime after giving new *Miranda* warning].)

Here, Jones waived his *Miranda* rights at the outset of the interview as there was no invocation of his rights.  "In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect 'must *unambiguously*' assert his right to silence or counsel.  [Citation.]  It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his rights. [Citation.]  Faced with an ambiguous or equivocal statement, law enforcement officers are not required under *Miranda, supra,* 384 U.S. 436,

12

either to ask clarifying questions or to cease questioning altogether." (*People v. Stitely* (2005) 35 Cal.4th 514, 535 (*Stitely*).)

In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained. (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125.)

## C.    Analysis

Jones contends he fully invoked his right to remain silent on two occasions.  Initially when he told the detectives, "That's all I want to say. You guys can go home to your wives and stuff like that."  And then again when he responded to the question "Is there anything else you want to get off your chest right now?" by stating, "No, that's it."  Alternately, Jones claims any selective invocation happened earlier than the point selected by the trial court.  We reject each claim.

### 1.    Jones's First Purported Invocation

Jones's first statement ("That's all I want to say.  You guys can go home to your wives and stuff like that") came after he explained why he was angry with Martinez.  Jones said he felt Martinez had "disrespected" and "punked" him by failing to pay rent and stealing his tools.  When the detective said, "Take me through it, man," Jones replied, "I'll just leave it at that, man." Jones then described himself as a "good person" who tried to help people but people kept "screwing [him] over."  The penultimate statement was, "For him just to rob me after being disrespectful just was the last straw, I guess."

We conclude that Jones's following remark about it being "all I wanted to say" and that the detectives could go home to their wives was not an

13

unambiguous, unequivocal assertion of his right to remain silent. The context of the statements suggests that after taking the detective through the situation of how he had been taken advantage of by Martinez and others, Jones had nothing more to say. Equally ambiguous was the "[y]ou guys can go to your wives" reference. By this statement, Jones could have been expressing his desire to change the subject or his unhappiness with the situation he was in.

Case law supports the determination that Jones's statements were ambiguous. For example, in *People v. Hayes* (1985) 38 Cal.3d 780, 785, after admitting he shot the victim and in response to an inquiry for more detail, the defendant asked, " 'Do I gotta still tell you after I admit it?' " was not deemed an invocation. (*Id.* at p. 784.) In another California Supreme Court case, a defendant who said, " 'That's all I have to say' " and " 'That's all I want to tell you,' " did not invoke his right to remain silent; it was a reasonable inference that what the defendant was saying was, "That's my story, and I'll stick with it." (*In re Joe R.* (1980) 27 Cal.3d 496, 516.)

Similarly, depending on the context, long periods of silence, or statements indicating uncertainty, reluctance, or frustration have not been deemed unambiguous invocations. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 382 [long period of silence was not an invocation]; see also *Stitely, supra,* 35 Cal.4th at p. 535 ["I think it's about time for me to stop talking" signaled frustration but was not a request to stop questioning]; *People v. Ashmus* (1991) 54 Cal.3d 932, 970 [" 'I ain't saying no more' " was an attempt to alter the course of questioning, not stop it altogether]; *People v. Silva* (1988) 45 Cal.3d 604, 629–630 [defendant's statement that he really did not want to talk about whether he was driving the truck deemed a selective invocation that did not require cessation of the questioning altogether]; *People v. Krebs*

14

(2019) 8 Cal.5th 265, 313 [request to be put in holding cell to think deemed merely a request for a break in questioning]; *People v. Jennings* (1988) 46 Cal.3d 963, 977–978 [" 'I'm not going to talk' " and " 'I'm not saying shit to you no more' " reflected momentary frustration]; *People v. Vance* (2010) 188 Cal.App.4th 1182, 1210–1211 [defendant's statements that he did not have a story and did not want to talk about it were not unequivocal invocations].)

The same is true here. Jones's statements did not clearly convey that he wanted to end the interview. Rather, they were ambiguous statements suggesting "That's all I have to say about being disrespected. End of story." They were also akin to statements saying, "That's my story and I'm sticking with it." Nothing in the statements suggested to a reasonable listener that Jones wanted to end the questioning.

This interpretation is bolstered by the context in which Jones made the statement. Moments before the statement Jones claims was an invocation, he said "I'll just leave it at that". Rather than leaving it at that, he continued, unprompted, to share his thoughts. And immediately after Jones made the statement that the detectives could go home to their wives, Detective Armijo responded, "My wife probably prefers when I'm at work. I've been married going on 19 years now, so she's probably pretty happy when I'm gone, staying away from her for a while." These comments about Detective Armijo's personal life did not constitute questions or statements reasonably likely to elicit an incriminating response. (*People v. Gamache* (2010) 48 Cal.4th 347, 387–388 (*Gamache*) [small talk permitted].) Then, without any question pending, Jones offered, "My thinking, just . . . What was I thinking? I should be smarter than this. I am smarter than this." When determining whether an invocation occurred, the language used must be considered in context as even language that is unambiguous on its face

15

may be equivocal in context. (*People v. Henderson* (2020) 9 Cal.5th 1013, 1023.) Here, the context confirms that Jones was not unequivocally requesting an end to the interrogation.

### 2. Jones's Second Purported Invocation

Just before a food break, the detective asked Jones, "Is there anything else you want to get off your chest right now?" Jones replied, "No, that's it." Jones contends this response was a complete invocation of his right to remain silent. Jones claims the "conversation clearly seemed over," when he and the detective made small talk about getting food and the detective's dog. Jones's unspoken belief about the direction of the conversation is not the test for determining whether he invoked his right to remain silent. Jones needed to unambiguously assert his right to remain silent, which he did not do as nothing in the ensuing small talk suggests that Jones wanted to stop the interview. (*Stitely, supra,* 35 Cal.4th at p. 535; *Gamache, supra,* 48 Cal.4th at pp. 387-388.)

### 3. Timing of Selective Invocation

The trial court found Jones selectively invoked his right to remain silent and stop questioning regarding the shooter, the specifics of the murder contract, and the insurance policies when, after 19 instances of saying skip or words to that effect, and approximately 4.5 hours into the interview, he said, "in this situation, I'm just not going to say anything" and then responded "Nah" when asked, "Do you think you'd ever answer it?" Jones contends the selective invocation happened "much earlier" than the point selected by the trial court. He does not specify the exact time but claims, "[a]t a minimum," all of his statements made after Detective Armijo acknowledged he knew Jones did "not 'want to talk about who actually shot Alex or how much you

16

paid to have it done' " should have been suppressed; this exchange occurred about 4 hours into the interview.  Again, we disagree.

In *Mosley,* the high court held "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " (*Mosely, supra,* 423 U.S. at p. 104.)  Police tactics that "fail[] to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind" are inconsistent with *Miranda.*  (*Mosely,* at pp. 105–106.)

Here, the detectives asked Jones about three main topics: (1) the shooter, including the shooter's identity, and how Jones found and communicated with the shooter; (2) the price of the murder contract, including if there was an outstanding balance; and (3) the insurance policies, specifically the number of policies taken out and the policy application process.  Each time Jones responded with "skip" or a similar response indicating he did not want to answer the question posed.  Individually, these responses were ambiguous as they could have signaled Jones's desire to return to the topics at a later point or his desire to avoid those topics while remaining open to talk about other things.

Recognizing the analytical difficulty in determining precisely when Jones's desire to cut off questioning on these topics occurred, the trial court considered the cumulative impact of Jones's words and conduct and concluded Jones objectively manifested his desire to stop questioning when he said, "in this situation, I'm just not going to say anything" and then responded "Nah" when asked, "Do you think you'd ever answer it?"  The court found that, after repeatedly responding with ambiguous statements like

17

"skip", "skip for now", or "I'd rather not say" when questioned about the shooter, the specifics of the murder contract, or the insurance policies, Jones's definitive response that he was not ever going to answer questions about these topics was an unambiguous invocation of his right to remain silent. (See *Stitely, supra,* 35 Cal.4th at p. 535.)

Notwithstanding Jones's argument that the selective invocation occurred earlier in the interview, whether reviewed independently or for substantial evidence, we conclude the trial court did not err in finding Jones selectively invoked his right to remain silent at the time he definitively said he was never going to answer questions about the shooter, the specifics of the murder contract, or the insurance policies.

### 4. Conclusion

In sum, the trial court did not err in denying in part and granting in part Jones's motion to suppress and by admitting evidence of his statements following his arrest.

## II. Trial Court Did Not Err in Admitting the Arrangement Exchange at the Second Trial

Jones contends the trial court improperly "reconsidered" its *Miranda* rulings from the first trial. He further claims that, on the merits, the trial court erred in concluding the arrangement exchange did not fall within the topics of his selective invocation.

### A. Trial Court Properly Considered the Motion

Jones contends the trial court had "no reason . . . to reconsider" its prior evidentiary rulings excluding the arrangement exchange. Preliminarily, the "reconsideration" label is somewhat of a misnomer. The People made a *new motion* in a *new trial following a mistrial*, as such, the case is not a " 'do over,' " but rather a " 'never done.' " (*People v. Riva* (2003) 112 Cal.App.4th

18

981, 992 (*Riva*). As such, all orders from the first trial are deemed vacated. (*People v. Sons* (2008) 164 Cal.App.4th 90, 99.)

Citing *Riva,* Jones argues that, in the absence of any changed circumstances, the trial court had no basis to revise its prior rulings. (See *Riva, supra,* 112 Cal.App.4th at pp. 992–993.) *Riva* does little to advance Jones's claim. *Riva* involved a new judge in a new trial following a mistrial; that new judge overruled the previous judge's *Miranda* ruling in the prior trial. (*Id.* at p. 985.) *Riva* explained the new judge had authority to make a new ruling, provided the defendant was given notice and an opportunity to be heard, and the revised ruling was not arbitrary or made without reason. (*Id.* at p. 992.)

Here, the *same* judge presided over both trials. Hence, the dangers of a new judge arbitrarily reversing a prior judge's ruling are not implicated. (Cf. *Riva, supra,* 112 Cal.App.4th at pp. 992–993.) Also, the record reflects the change in the *Miranda* ruling afforded due process to Jones and was the product of thoughtful deliberation. The trial court read and considered extensive supplemental briefing, heard oral argument, and issued a comprehensive written order setting forth the reasons for its ruling. The trial court acted well within its inherent authority when it revised its *Miranda* ruling in the second trial.

### B. Admission of the Arrangement Exchange Did Not Violate Jones's Selective Invocation of his Miranda Rights

Jones claims the trial court should have excluded the arrangement exchange because it pertained to the topics on which he selectively invoked his *Miranda* rights.

As discussed *ante*, the trial court determined Jones validly invoked his right to remain silent on the following topics: (1) the number of life insurance policies taken out; (2) the policy application process; (3) how he initially found

19

the shooter; (4) the manner and means by which he communicated with the shooter; (5) the price of the murder contract; and (6) whether he still owed money on the contract. At the first trial, based on these topics, the trial court suppressed 17 interview excerpts, which included the arrangement exchange.

As noted, the court admitted the arrangement exchange at the second trial, which was as follows:

| | |
|---|---|
| Detective: | What was the arrangement that was made? |
| Detective: | We've already talked about it, man. |
| Jones: | Yeah. |
| Detective: | So it's not like it's something new. |
| Jones: | What was the question again? Sorry. |
| Detective: | I said, what was the arrangement that was made? What were you going to do for what to be done? |
| Jones: | I was going to pay X amount of dollars for somebody to take care of him. |
| Detective: | What do you mean take care of? |
| Jones: | To shoot him. |
| Detective: | So there's no confusion, to shoot who? |
| Jones: | Alexander Martinez. |

Jones insists the detective's question—"what was the arrangement"—clearly pertained to the shooter, which was one of the topics he did not want to discuss.

Although it is clear Jones did not want to identify the shooter out of concern for his personal safety, the challenged questions did not directly implicate the topics on which he selectively invoked his right to remain silent—they did not seek insurance policy information, the identity of the shooter, how they communicated, or the specifics about the contract.

20

Similarly, Jones's answer—"I was going to pay X amount of dollars for somebody to take care of him"—did not reveal anything about the shooter's identity or the cost of the murder contract.

Questions before and after the arrangement exchange support the conclusion that the challenged questions did not violate the scope of Jones's selective invocation: "I know you don't want to talk about who actually shot Alex or how much you paid to have it done"; "Without naming no names, how did the money get to him?; "Since I know you don't want to talk about how you got in touch with this guy or any of that stuff, I respect you. Although I wish you would tell me." These statements reflect the detectives were aware of Jones's concern about being labelled a snitch. The open-ended questions regarding "What was the arrangement that was made" did not violate Jones's selective invocation of his right to remain silent.

## C.  Any Error Was Harmless

Finally, we conclude any error in admitting the arrangement exchange was harmless beyond a reasonable doubt. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 307–310; *Chapman v. California* (1967) 386 U.S. 18, 24.) To be sure, an important difference between the first and second trials was the admission of the arrangement exchange. (See *People v. Diaz* (2014) 227 Cal.App.4th 362, 385 [reviewing court may consider as one factor in determining prejudice that prior juries had hung absent the alleged error].) However, we cannot presume this difference resulted in prejudicial error. As Justice Corrigan explained in her concurring opinion in *In re Richards* (2016) 63 Cal.4th 291, 316, "it is very difficult to read any significance into the fact that [another jury] hung in this case. Juries fail to agree for a variety of reasons and the rules of evidence prohibit inquiry into the jurors' subjective reasoning process. (Evid. Code § 1150, subd. (a).) . . . [T]he disagreement

21

may be driven as much by the personality of a juror, a uniquely held world view, or even some friction during deliberations, as by any weakness in the underlying case.  The point is that, in most cases, a reviewing court, writing at a great remove from trial proceedings, may seldom know why a jury did not reach consensus.  Such is the case here."

The evidence of Jones's guilt was formidable even without the arrangement exchange.  J.M. testified that Jones told her "Alex had owed him money for rent and wouldn't pay him" and had "robbed" Jones's house.  Jones told J.M. "he had Alex murdered" when Jones was out of town; Jones even showed J.M. photos in his phone that established he was away at the time of the murder.  M.P. also testified that Jones became upset with Martinez about unpaid bills and the fact Martinez had stolen property from Jones.  Jones told M.P. "he was going to hire somebody" to kill Martinez.  Jones used a tracker to locate Martinez so that he could be killed.  When Jones returned from vacation he told M.P. "it was done," which she later realized meant that Jones had Martinez killed.

Even before mention of the arrangement exchange, Jones made a series of incriminating statements about feeling disrespected by Martinez and needing to take revenge.  He described the robbery as "the last straw".  He admitted he put a tracker on Martinez's car and that initially he only wanted to beat him up.  Eventually, as his anger grew, he decided it was more of a "two birds with one stone" situation, where he could get revenge and use the "money [from the insurance policies] to start moving forward" with his life.

Jones also made numerous incriminating statements when he spoke with the district attorney after he voluntarily waived his *Miranda* rights.  Jones said in the "10 to 15 years" he had known Martinez, "all the little stuff . . . just added up."  And things "went over" following the September 2015

22

robbery. Jones admitted that during the "months" he searched for Martinez his "anger grew[.]" Jones further admitted that Martinez had been killed in April, which he had "thought . . . would be a good time" because he (Jones) would be in Mexico.

On the record before us, we conclude any error in admitting evidence of the arrangement exchange was harmless beyond a reasonable doubt.

## III. Prosecutor's Comments on Jones's Silence Were Harmless

The prosecutor made several remarks during closing argument about Jones's refusal to talk about the identity of the shooter and the cost of the murder contract: "[t]he only thing Mr. Jones does not want to talk about during the interview is the identity of the shooter"; "on a portion of the video where Detective Armijo is discussing the way to find out who the shooter is, Mr. Jones declares he doesn't want to talk about that"; "Mr. Jones does not want to assist Detective Armijo in locating who shot Alexander Martinez"; and "When the police asked him, is there any money still owed on the contract? He said, 'I don't' want to talk about that, skip that.' " Jones contends this constituted misconduct as the prosecutor commented on his silence after he selectively invoked his *Miranda* rights. (*Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*).

A question of forfeiture is immediately apparent as Jones did not object to the prosecutor's argument on *Doyle* error grounds or otherwise raise a prosecutorial misconduct claim. (*People v. Collins* (2010) 49 Cal.4th 175, 202 [an objection is required to preserve *Doyle* error for appellate review]; *People v. Clark* (2016) 63 Cal.4th 522, 577 [preservation of prosecutorial misconduct claim on appeal required timely objection and request for admonition].) Jones acknowledges the omission but claims his trial counsel rendered ineffective assistance of counsel. We disagree.

23

*Doyle* holds the prosecution may not, consistent with due process and fundamental fairness, use post arrest silence following *Miranda* warnings to impeach a defendant's testimony at trial. (*Doyle, supra,* 426 U.S. at pp. 617–618.)  The principles of *Doyle* apply even where, as here, a defendant does not take the stand in his own defense because " '[a] defendant is entitled to rely on the assurance . . . that his silence will not be used against him.' [Citation.]" (*People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1557.)

Citing *People v. Hurd* (1998) 62 Cal.App.4th 1084, the Attorney General asserts that *Doyle* does not protect against prosecutorial use of a defendant's refusal to answer selected questions after waiving *Miranda* rights and electing to speak to law enforcement authorities.  The *Hurd* court stated: "A defendant has no right to remain silent selectively.  Once a defendant elects to speak after receiving a *Miranda* warning, his or her refusal to answer questions may be used for impeachment purposes *absent any indication that such refusal is an invocation* of *Miranda* rights . . . . [Defendant] was not induced by the *Miranda* warning to remain silent . . . . [¶] . . . We do not think *Doyle* was meant to preclude the prosecutor from commenting on highly relevant evidence bearing on [defendant's] credibility, including [defendant's] refusal to provide critical details, when he had voluntarily waived his right to remain silent." (*Hurd* at pp. 1093–1094, italics added.)

As our Supreme Court observed in *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 118, whether *Doyle* precludes the use of partial silence to the extent that the defendant relied on a *Miranda* warning in refusing to answer specific questions is open for debate.  Here, the challenged comments clearly were based on topics that Jones had selectively invoked his right to remain silent.  However, we need not resolve the open question of whether

24

the prosecutor could comment on Jones's refusal to identify the shooter and to discuss the murder contract without violating *Doyle*, because any such error would be harmless beyond a reasonable doubt in view of the considerable evidence of Jones's guilt (described *ante*). The lack of prejudice stemming from the assumed error is fatal to Jones's claim that his trial counsel rendered ineffective assistance in failing to object to the challenged comments.

## DISPOSITION

The judgment is affirmed.

_____
Petrou, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Fujisaki, J.

A164421/*People v. Jones*